*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0456p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHN DOE,

        *Plaintiff-Appellant,*

      *v.*

PHIL BREDESEN, Governor of the State of
Tennessee, CHARLES M. TRAUGHBER, Chairman,
Tennessee Board of Probation and Parole, MARK
GWYN, Director of the Tennessee Bureau of
Investigation, and RANDALL NICHOLS, District
Attorney General 6th Judicial District,

        *Defendants-Appellees.*

No. 06-6393

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 06-00072—Thomas W. Phillips, District Judge.

Submitted: July 25, 2007

Decided and Filed: November 16, 2007

Before: KEITH and GRIFFIN, Circuit Judges; VAN TATENHOVE, District Judge.[*]

---

## COUNSEL

**ON BRIEF:** Angela R. Morelock, Knoxville, Tennessee, for Appellant. Michael A. Meyer,
Lyndsay Fuller, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees.

      GRIFFIN, J., delivered the opinion of the court, in which VAN TATENHOVE, D. J., joined.
KEITH, J. (pp. 10-13), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

      GRIFFIN, Circuit Judge. Plaintiff-appellant John Doe pleaded guilty in the Criminal Court
of Knox County, Tennessee, to attempted aggravated kidnapping in violation of TENN. CODE ANN.
§§ 39-12-101 and 31-13-304, and two counts of sexual battery by an authority figure in violation

---

[*] The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky,
sitting by designation.

of TENN. CODE ANN. § 39-13-527.  After Doe was convicted and sentenced, the Tennessee Legislature enacted the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004 ("the Registration Act"), TENN. CODE ANN. § 40-39-201 *et seq.*, which became effective on August 1, 2004.  The Registration Act reclassified Doe as a violent sexual offender, *see* TENN. CODE ANN. § 40-39-202(24)(j), and required him to comply with the requirements of the Tennessee Bureau of Investigation ("TBI") Sexual Offender Registry for the rest of his life, *see* TENN. CODE ANN. § 40-39-207(g)(1)(B).  The Tennessee Legislature also enacted the Tennessee Serious and Violent Sex Offender Monitoring Pilot Project Act ("the Monitoring Act"), TENN. CODE ANN. § 40-39-301 *et seq.,* which became effective July 1, 2004.[1]  The Monitoring Act authorized the Tennessee Board of Probation and Parole ("the board") to subject a convicted sexual offender to a satellite-based monitoring program for the duration of his probation.  TENN. CODE ANN. § 40-39-303.  In August 2005, Doe's probation officer notified him that he would be required to wear a global positioning ("GPS") device at all times beginning in September 2005.

Doe brought suit in the United States District Court for the Eastern District of Tennessee ("the district court") alleging that because he was convicted before the effective date of the Registration and Monitoring Acts, the application of the Acts' requirements to him violated the Ex Post Facto Clauses of the United States Constitution (Article I, Section 3, Clause 3) and the Tennessee Constitution, as well as his right to procedural due process and his right against self-incrimination under the Fifth Amendment of the U.S. Constitution, and his right to privacy under both constitutions.  The government moved to dismiss the complaint under FED. R. CIV. P. 12(b)(6) for failure to state a claim on which relief could be granted, and Doe filed an opposition brief that supported only the Ex Post Facto claims.  Doe's opposition brief also sought to raise a claim that was not in his complaint – that application of the Registration and Monitoring Acts to him violated his plea agreement.

The district court ruled that Doe's ex post facto claims were meritless, the government had not breached the plea agreement, and Doe had abandoned his other claims.  The district court dismissed the complaint, and Doe timely appealed.  For the reasons that follow, we affirm.  In doing so, we hold, inter alia, that the Registration Act (TENN. CODE ANN. § 40-39-201 *et seq*.) and the Monitoring Act (TENN. CODE ANN. 40-39-301 *et seq*.) do not violate the Ex Post Facto Clause of the United States Constitution.

I.

Between January 1, 1995, and July 1, 2004, Doe pleaded guilty in the Criminal Court of Knox County, Tennessee, to attempted aggravated kidnapping in violation of TENN. CODE ANN. §§ 39-12-101 and 31-13-304, and two counts of sexual battery by an authority figure in violation of TENN. CODE ANN. § 39-13-527.  At the time Doe was convicted, each of his sexual battery offenses was termed by Tennessee law as a "sexual offense" and he was classified as a "sexual offender."  Under Tennessee law, as it existed at the time of his convictions, Doe had the right, ten years after the termination of his probation, to petition the circuit court to relieve him of the continued filing of registration and monitoring forms and to expunge all data stored in the central record system about him.

Since being placed on probation, Doe met the sexual offender registration and monitoring requirements that were imposed on him by former TENN. CODE ANN. § 40-39-103, which has now been repealed.

---

[1]In conducting their inquiry, the district court and the parties have treated TENN. CODE ANN. § 40-39-201 *et seq.* and TENN. CODE ANN. § 40-39-301 *et seq.* as a single Act.  We believe, however, that the proper mode of analysis is to treat the Registration and Monitoring Acts as two separate acts.

The Registration Act, TENN. CODE ANN. § 40-39-201 *et seq.*, became effective on August 1, 2004, and repealed the prior Sexual Offender Act, which had been codified at TENN. CODE ANN. §§ 40-39-101 through 40-39-111.[2]    Among other provisions, the Registration Act repealed and replaced the sexual offender classification system which had been found at former TENN. CODE ANN. § 40-39-301(1) and (3).

Under the new TENN. CODE ANN. § 40-39-202(23) and (24), Doe's criminal offense was retroactively reclassified as a "violent sexual offense," and he was reclassified retroactively as a "violent sexual offender." *See* TENN. CODE ANN. § 40-39-301(3) ("'Violent sexual offender' also includes any person who has been released on probation or parole following any conviction for a sexual offense, as defined in subdivision (2), to the extent that the person continues to be subject to active supervision by the board of probation and parole as defined in law."); TENN. CODE ANN. § 40-39-301(2)(A)(xi) (defining "sexual offense" to include sexual battery by an authority figure in violation of TENN. CODE ANN. § 39-13-527).

Additionally,  revised TENN. CODE ANN. § 40-39-207(f)(1)(B) requires a violent sexual offender to comply with the registration, verification, and tracking requirements of the TBI Sexual Offender Registry ("SOR") for the rest of his life.[3]    Further, the Monitoring Act requires the TBI to implement continuous satellite-based monitoring of violent sexual offenders.  TENN. CODE ANN. §§ 40-39-302(b)(1) and 303.  The Monitoring Act specifically authorizes the TBI to use a global positioning system ("GPS") with either passive (once-a-day) reporting of the offender's location or active (near-real-time) reporting of the offender's prescriptive or proscriptive location and schedule requirements, *see* TENN. CODE ANN. § 40-39-302(b)(1)(A and B), and it authorizes the board of probation and parole to charge the offender a fee to recoup the cost of the monitoring program. TENN. CODE ANN. § 40-39-305.  The Monitoring Act authorizes the board of probation and parole to exercise discretion as to which parolees or probationers will be subject to these various requirements. TENN. CODE ANN. § 40-39-303(a).

An offender commits a Class E felony if he knowingly fails to comply with any of the Acts' requirements, such as filing a timely and accurate registration form with the TBI, signing the form, paying annual administrative costs if able to do so, and timely disclosing required information to a designated law enforcement agency.  TENN. CODE ANN. § 40-39-208(a) and (b).  Also, it is a separate crime to tamper with or remove the GPS tracking device. TENN. CODE ANN. § 40-39-304.[4]

Doe alleges that the GPS tracking device is not realistically concealable, and he contends that it has a marked effect on his lifestyle and freedom of movement and action.  In Doe's words, he

> is required to carry with him at all times when not at his residence a relatively large box which contains the electronics necessary for the monitoring to take place.  This box must be worn on one's person outside any coat or other outer garment and

---

[2]Tennessee 2004 Pub. Acts, ch. 921, section 4 provides, "Effective August 1, 2004, Tennessee Code Annotated, Title 40, Chapter 39, Part 1, is amended by deleting the part in its entirety.  All sexual offenders who were, prior to such date, subject to the provisions of  Tennessee Code Annotated, Title 40, Chapter 39, Part 1, shall, on and after such date, be subject to the provisions of  Tennessee Code Annotated, Title 40, Chapter 39, Part 2, created by this act."

[3]If Doe was merely a sexual offender instead of a "violent sexual offender," he would have gained the right, ten years after the end of his active supervision on parole or probation, to petition the TBI for termination of his registration requirements.  TENN. CODE ANN. § 40-39-207(a).

[4]The Registration Act also added restrictions on where a sexual offender or violent sexual offender may live, work, and travel, *see* TENN. CODE ANN. § 40-39-211, but Doe does not challenge these restrictions.

therefore is obvious to any onlooker. Upon going into a building, [he] must wait several minutes before entering, presumably to allow the device to reset. When inside a building, [he] must go outside at least once every hour so that monitoring can take place. The device is not waterproof, and [he] is not allowed to swim or participate in any other water activity. Baths at home are impossible.

Furthermore, the device has caused [him] added stress and many inconveniences as it does not always work properly. While on vacation, for which [he] obtained prior permission from his probation officer and a judge, [he] received at least six telephone messages from someone at the probation office threatening him with immediate arrest if he did not return a telephone call to the probation office at once. This entire event was because the Global Positioning System monitoring system could not locate him. At other times the [GPS] monitoring system either does not receive or transmit information correctly. When this happens [he] has spent up to an hour on the telephone with someone in the probation office to correct the problem. On one occasion [he] had to stand in the rain, for over thirty minutes, for all his neighbors to see, while the probation office attempted to fix the problem. Appellant is required to purchase the device at a cost of $50.00.

Doe filed a complaint and application for a temporary restraining order ("TRO") and preliminary injunction ("PI") in March 2006, and the government filed a brief in opposition to the TRO and PI and a motion to dismiss the complaint in April 2006. The district court granted the government's motion to dismiss the complaint, and Doe timely appealed.

II.

Because the district court dismissed Doe's complaint on legal grounds, we review its decision de novo. *United States v. Bowman* 173 F.3d 595, 597 (6th Cir. 1999) ("This Court reviews a denial of a motion to dismiss *de novo*, as it is a purely legal question.") (citation omitted). Specifically, the application of the Ex Post Facto Clause is a legal question subject to de novo review. *United States v. Richardson*, 437 F.3d 550, 555 (6th Cir. 2006)).[5]

On appeal, the district court's interpretation of state law (in this case, the Tennessee Constitution) is likewise governed by the de novo standard. *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 660 (6th Cir. 2005) (citation omitted).

III.

When considering a motion to dismiss for failure to state a claim, we must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle him to relief. *First American Title Co. v. DeVaugh*, 480 F.3d 438, 443-44 (6th Cir. 2007) (citing *Conley v. Gibson*, 355 U.S. 41, 45 (1957)). "'Although this is a liberal pleading standard, it requires more than the bare assertion of legal conclusions. Rather, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" *Id.* at 444 (quoting *S.E. Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 671-72 (6th Cir. 2006).

---

[5]As noted below, Doe abandoned his federal due process and right-to-privacy claims by failing to support them in his brief opposing the government's motion to dismiss.

IV.

The United States Constitution prohibits states from imposing ex post facto laws. U.S. CONST. art. I, sec. 10, cl. 1. The Ex Post Facto Clause is implicated where a law punishes retrospectively: "'a law is retrospective if it changes the legal consequences of acts committed before its effective date.'" *United States v. Davis*, 397 F.3d 340, 347 (6th Cir. 2005) (quoting *Miller v. Florida*, 482 U.S. 423, 430 (1987)). "'[T]he focus of the *ex post facto* inquiry,'" however, "'is not whether a legislative change produces some ambiguous sort of 'disadvantage' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which the crime is punishable.'" *Dyer v. Bowlen*, 465 F.3d 280, 289 (6th Cir. 2006) (quoting *Calif. Dep't of Corr. v. Morales*, 514 U.S. 499, 506 n.3 (1995)).

When evaluating an ex post facto claim, our first task is to "ascertain whether the legislature meant to establish 'civil' proceedings." *Smith v. Doe*, 538 U.S. 84, 92 (2003) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997). If the intent of the legislature was to impose punishment, that ends the inquiry. If, however, "'the intention was to enact a regulatory scheme that is civil and nonpunitive, we further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Hendricks*, 521 U.S. at 361 (quoting *United States v. Ward*, 448 U.S. 242, 248-49 (1980)). Because we "ordinarily defer to the legislature's stated intent, . . . only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty, . . . ." *Smith*, 538 U.S. at 92 (internal citations and quotations omitted).

"Whether a statutory scheme is civil or criminal 'is first of all a question of statutory construction.'" *Smith*, 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 561) (other citation omitted). We consider the statute's text and its structure to determine the legislative objective. *Smith*, 538 U.S. at 92-93 (citing *Flemming v. Nestor*, 363 U.S. 603, 617 (1960)). We first ask whether the Tennessee Legislature, in passing the Acts, "indicated either expressly or impliedly a preference for one label or the other," i.e., civil or criminal. *Smith*, 538 U.S. at 93 (citing *Hudson v. United States*, 522 U.S. 93, 99 (1997)). Regarding the Registration Act, the Tennessee Legislature expressed its regulatory objective in the text of the statute itself:

> To protect the safety and general welfare of the people of this state, it is necessary to provide for continued registration of offenders and for the public release of specified information regarding offenders. This policy of authorizing the release of necessary and relevant information about offenders to members of the general public is a means of assuring public protection and shall not be construed as punitive . . . .

> The general assembly also declares . . . that in making information about certain offenders available to the public, the general assembly does not intend that the information be used to inflict retribution or additional punishment on any such offenders.

TENN. CODE ANN. §§ 40-39-201(b)(6) and (8). With respect to the Monitoring Act, the Tennessee Legislature stated its intent to "utilize the latest technological solutions to monitor and track serious criminal offenders and violent sex offenders . . . ." 2004 Pub. Acts, Ch. 889, § 2. The legislature set forth statistics with regard to the abnormally high recidivism rate among sex offenders and stated its findings that intensive supervision is "a crucial element to both the rehabilitation of the convict and the safety of the surrounding community." *Id*. at § 3. The Tennessee Legislature added that the electronic monitoring would enable law enforcement to geographically link offenders with reported crimes, but also to possibly exclude released offenders from ongoing investigations. *Id*. In light of this clear declaration of legislative intent, the district court correctly found that the Tennessee General Assembly intended to implement a civil regulatory scheme, not a punitive scheme.

Indeed, as the United States Supreme Court has repeatedly held, the imposition of restrictive measures on sex offenders adjudged to be potentially dangerous is "a legitimate *nonpunitive* governmental objective . . . ." *Smith*, 538 U.S. at 93 (quoting *Hendricks*, 521 U.S. at 363) (emphasis added). Here, as in *Smith* (Alaska's requirement that released sex offenders register and submit quarterly verifications) and *Hendricks* (post-incarceration confinement of sex offenders), nothing on the face of the statutes suggest that the legislature sought to create anything other than a civil scheme designed to protect the public from harm. *Smith*, 538 U.S. at 93 (citing *Hendricks*, 521 U.S. at 361). Accordingly, we agree with the district court that the Tennessee Legislature's purpose in enacting the challenged provisions of the Acts was to create a civil, nonpunitive regime.

Notwithstanding our ascertainment of legislative intent, we must still analyze the practical effect of the challenged provisions of the Acts. The Supreme Court directs us to use these factors in assessing the provisions' actual effect on sex offenders such as Doe:

> whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with regard to this purpose.

*Smith*, 538 U.S. at 97 (discussing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)). Although these factors are "most relevant to our analysis," they are not necessarily exhaustive or dispositive. *Id*.

The Acts' registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment, and the district court further correctly found that they do not constitute an affirmative disability or restraint in light of the legislature's intent. The Registration and Monitoring Acts do not increase the length of incarceration for covered sex offenders, nor do they prevent them from changing jobs or residences or traveling to the extent otherwise permitted by their conditions of parole or probation. Perhaps most significantly, the Supreme Court held recently, in sustaining the Alaska Sex Offender Registration Act against an ex post facto challenge, that lifetime registration and monitoring of sexual offenders is "less harsh" than other sanctions that the Court has historically considered non-punitive, such as revocation of a medical license, preclusion from work as a banker, and preclusion from work as a union official. *See Smith*, 538 U.S. at 100 (collecting cases).

The dissent characterizes the wearing of the GPS monitoring system as "a catalyst for public ridicule" akin to traditional forms of community shaming or humiliation. We disagree. The device that Doe must wear is relatively unobtrusive, measuring only 6 inches by 3.25 inches by 1.75 inches and weighing less than a pound. In its size, shape, and placement (hooked to a belt), it appears very similar to a walkie-talkie or other nondescript electronic device. Furthermore, we have every reason to believe that the dimensions of the system, while not presently conspicuous, will only become smaller and less cumbersome as technology progresses. We similarly cannot agree that the device's appearance would suggest to the casual observer that the wearer is a criminal, let alone a sex offender. The monitoring system could easily be viewed as a two-way communication device, a personal organizer, a medical apparatus, or as a monitoring system for employees entrusted with company property, such as delivery drivers or couriers. However, even assuming the public would recognize the device as a criminal monitor, there is no evidence to suggest an observer would understand the wearer to be a sex offender. These devices can be utilized in a variety of contexts, such as pretrial monitoring and work release, and are, in fact, advertised for use in such situations. Indeed, the dissent can only point to a single incident wherein a member of the public recognized the device as a monitor, and, even then, there was no evidence to suggest that the observer knew the device to be one that monitored sex offenders, as opposed to criminals generally.

Under the next *Mendoza-Martinez* factor, the district court correctly noted that, although the Acts may have some deterrent effects and deterrence is one purpose of punishment, that does not render the Acts punitive for purposes of the Ex Post Facto Clause. As we explained when we upheld an earlier Tennessee sex offender registration act, "'[t]o hold that the mere presence of a deterrent purpose renders . . . sanctions 'criminal' . . . would severely undermine the government's ability to engage in effective regulation. . . .'" *Cutshall v. Sundquist*, 193 F.3d 466, 475-76 (6th Cir. 2003) (quoting *Hudson*, 522 U.S. at 105). *Accord Hatton v. Bonner*, 356 F.3d 955, 965 (9th Cir. 2004) (rejecting ex post facto challenge to California's sex offender registration act and stating that "[i]t is possible that sex offender registration statutes deter persons who would otherwise commit a crime that would require them to register as a sex offender. Nonetheless, this observation does not negate the overall remedial and regulatory nature of [the act]. 'Although registration arguably has a deterrent effect . . . deterrence can serve both criminal and civil goals.'") (quoting *Russell v. Gregoire*, 124 F.3d 1079 (9th Cir. 1997) (rejecting ex post facto challenge to Washington state sex offender registration statute)).[6]

The district court also analyzed the next *Mendoza-Martinez* factor correctly: whether the Acts have a rational connection to a nonpunitive purpose. In view of United States Department of Justice statistics cited in the Registration Act's preamble, the accuracy and relevance of which have not been contested by Doe, the Tennessee General Assembly could rationally conclude that sex offenders present an unusually high risk of recidivism, and that stringent registration, reporting, and electronic surveillance requirements can reduce that risk and thereby protect the public without further "punishing" the offenders. Where there is such a rational connection to a nonpunitive purpose, it is not for the courts to second-guess the state legislature's policy decision as to which measures best effectuate that purpose. *Accord Doe v. Miller*, 405 F.3d 700 (8th Cir.) (rejecting ex post facto and other constitutional challenges to Iowa statute that prohibited people who had been convicted of a sex offense against a minor from living within 2,000 feet of a school or child-care facility and stating "the requirement of a 'rational connection' is not demanding: [a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance.") (quoting *Smith*, 538 U.S. at 103), *cert. denied*, 546 U.S. 1034, 126 S. Ct. 757 (2005).

The district court also correctly analyzed the next *Mendoza-Martinez* factor: whether the Acts are excessive in relation to their regulatory purpose. The Supreme Court cautions that this excessiveness inquiry "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 102. Doe provides no basis for us to conclude that the Acts' requirements are excessive in relation to its legitimate nonpunitive purpose of protecting the public from the undisputed high risk of recidivism. *Cf. Bush v. Whaley*, No. 2:06cv292, 2006 WL 2577819, at *6 (M.D. Ala. Sept. 6, 2006) (unpublished) (holding that the Alabama Community Notification Act, which required sex offenders to register with the police, required police to notify residents when an offender moves into their neighborhood, and restricts where and with whom an offender may work, was not excessive in relation to its nonpunitive objective merely because its duration was lifelong and it placed no limit on the number of persons who could access offender information on the Internet); *Doe v. Baker*, No. 1:05cv265, 2006 WL 905368, at *5 (N.D. Ga. Apr. 5, 2006) (unpublished) (rejecting ex post facto challenge to Georgia statute that prohibited sex offenders covered by registration act from living within 1,000 feet of any child-care facility, school, or area where minors congregate; holding that

---

[6]*Cf. Hobbs v. County of Westchester*, 397 F.3d 133 (2d Cir.), *cert. denied*, 546 U.S. 815, 126 S. Ct. 340 (2005) (rejecting ex post facto challenge to county executive order that prohibited persons convicted of sex offenses against minors from obtaining a permit for a performance or similar activity on county property that might entice children to congregate around that person and stating "although potentially related to deterrence and prevention, the stated purpose of the Executive Order is simply the protection of children. The relationship is not sufficient to make the Prohibition a criminal penalty. . . .") (citing *Smith*, 538 U.S. at 102).

statute did not become excessive in relation to its nonpunitive objective merely because construction of a school in plaintiff-offender's neighborhood forced him to move from his residence of sixteen years in order to comply with the statute).

The dissent argues the Monitoring Act is unreasonable and excessive because it cannot "prevent offenders, like Doe, from committing a new crime." This supposition is faulty for two reasons. First, as even the dissent itself recognizes, the monitoring system has a deterrent effect on would-be re-offenders. Second, the ability to constantly monitor an offender's location allows law enforcement to ensure that the offender does not enter a school zone, playground, or similar prohibited locale. In any event, our role is not to invalidate the program if the Tennessee Legislature has not struck the perfect balance between the regulatory purpose of the program and its burdens on Tennessee citizens, but rather to determine whether the means chosen are reasonable. *Smith*, 538 U.S. at 105. We conclude that they are.

The district court also did not err in its conclusion that the last two *Mendoza-Martinez* factors – whether the conduct to which the Acts apply was already a crime, and whether the Acts came into play only upon a finding of *scienter* – were not particularly germane and did not alter the conclusion that the effects of the Registration Act and Monitoring Act are not so punitive as to negate the State's clearly expressed intent to create a civil regulatory scheme.

Finally, we note that our sister circuits have likewise consistently and repeatedly rejected ex post facto challenges to state statutes that retroactively require sex offenders convicted before their effective date to comply with similar registration, surveillance, or reporting requirements. *See Weems v. Little Rock Police Dep't*, 453 F.3d 1010 (8th Cir. 2006), *cert. denied sub nom. Weems v. Johnson*, – U.S. –, 127 S. Ct. 2128 (2007); *Johnson v. Terhune*, 184 F. App'x 622 (9th Cir. 2006); *Steward v. Folz*, 190 F. App'x 476 (7th Cir. 2006); *Kirschenhunter v. Sheriff's Office, Beauregard Parish*, 165 F. App'x 362, 363 (5th Cir. 2006), *cert. denied*, – U.S. –, 127 S. Ct. 255 (2006); *Szczygiel v. Madelen*, 116 F. App'x 224 (10th Cir. 2004); *Herrera v. Williams*, 99 F. App'x 188 (10th Cir. 2004) (application of New Mexico Sex Offender Registration Act to person who was convicted before its effective date did not violate the Ex Post Facto Clause); *Moore v. Avoyelles Corr. Ctr.*, 253 F.3d 870 (5th Cir. 2001); *Burr v. Snider*, 234 F.3d 1052 (8th Cir. 2000) (North Dakota sex offender registration statute); *Femedeer v. Haun*, 227 F.3d 1244 (10th Cir. 2000) (Utah sex offender registration and notification statute); *Roe v. Office of Adult Prob.*, 125 F.3d 47 (2d Cir. 1997) (Connecticut statute); *Doe v. Pataki*, 120 F.3d 1263 (2d Cir. 1997) (New York Sex Offender Registration Act).[7]

V.

Doe's complaint further alleged that application of the Acts to him violated his fundamental federal constitutional rights to privacy and substantive due process, procedural due process, and his privilege against self-incrimination, as well as his right to privacy under the Tennessee Constitution's article I, sections 3, 7, 8, 19 and 27. The district court correctly noted, however, that Doe abandoned those claims by failing to raise them in his brief opposing the government's motion to dismiss the complaint. Accordingly, we need not consider those claims. *See Huge v. General Motors Corp.*, 62 F. App'x 77, 79 (6th Cir. 2003) ("Huge failed to argue that GMC discriminated against her because of a learning disability to the district court, and therefore we need not consider that claim."); *cf. Meredith v. Allen Cty. War Memorial Hosp. Comm'n*, 397 F.2d 33, 34 n.2 (6th Cir. 1968) ("Plaintiff also alleged in his complaint that jurisdiction existed under the antitrust laws, but

---

[7] *Cf. Rieck v. Cockrell*, 321 F.3d 487 (5th Cir. 2003) (Ex Post Facto Clause permitted the application of a Texas statute that required sex offender counseling to a person who was convicted before its effective date).

this allegation was not advanced either in opposition [to] defendants' motion to dismiss or on appeal, and we therefore assume that the claim of antitrust violation has been abandoned.").

## VI.

Finally, Doe contended that the application of the Acts violated the Tennessee Constitution's ex post facto clause (TENN. CONST. art. I, sec. 11).  When a party raises a challenge under both the U.S. Constitution's Ex Post Facto Clause and the Tennessee Constitution's ex post facto clause, the Tennessee appellate courts conduct a single analysis for both claims, and they follow U.S. Supreme Court precedent when interpreting both the federal and state clauses.  *See, e.g., King v. Tenn. Bd. of Paroles*, No. M2005-2821-COA-R3-CV, 2007 WL 1555815 (Tenn. Ct. App. May 29, 2007); *Powers v. Tenn. Bd. of Probation & Paroles*, No. M2005-1529-COA-R3-CV, 2007 WL 1515141, at *7 (Tenn. Ct. App. May 23, 2007); *In re Rahim*, No. M2006-2216-COA-R3-CV, 2007 WL 1308322, at *2 (Tenn. Ct. App. May 3, 2007) ("The ex post facto prohibition found in both the Tennessee Constitution and the United States Constitution is aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'") (quoting *Calif. Dep't of Corrs. v. Morales*, 514 U.S. 499, 504 (1995)).

Accordingly, because Doe's claim under the federal Ex Post Facto Clause fails, his claim under the Tennessee ex post facto clause fails as well.

## VII.

For the foregoing reasons, we affirm the dismissal of Doe's complaint.

---

## CONCURRING IN PART, DISSENTING IN PART

---

DAMON J. KEITH, Circuit Judge, concurring in part and dissenting in part. The crux of the matter before us concerns Tennessee's Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004 (the "Registration Act"), TENN. CODE ANN. § 40-39-201 *et seq*, and the Tennessee Serious and Violent Sex Offender Monitoring Pilot Project Act (the "Surveillance Act"), TENN. CODE ANN. § 40-39-301 *et seq*. Doe, a convicted sexual offender, alleges that the Registration Act and the Surveillance Act violate the Ex Post Facto Clause of the United States Constitution. Specifically, Doe takes issue with (1) the retroactive application of the Registration Act (§ 40-39-207(f)(1)(B)), which requires Doe to register with the Tennessee sexual offender registry for the remainder of his life, and (2) the enactment and retroactive application of the Surveillance Act (§ 40-39-301 *et seq*.), which allows the Tennessee Board of Probation and Parole to enroll Doe in a "Satellite-Based Monitoring Program" to monitor (via a global positioning system ("G.P.S.")) his movements while on probation. Because our Circuit has foreclosed Doe's argument with respect to the Registration Act, *see Cutshall v. Sundquist*, 193 F.3d 466, 476-77 (6th Cir. 1999), I concur with the majority's dismissal of this claim.[1] However, as to the Surveillance Act, I strongly disagree with the majority's decision to affirm the district court's dismissal of this claim. I cannot, in good conscience, join my colleagues' opinion which finds no constitutional violation in requiring Doe to wear a relatively large box as a symbol of his crime for all to see. The Surveillance Act, particularly the satellite-based monitoring program, as applied to Doe, is punishment, excessive, and indeed, the modern day "scarlet letter." I vigorously dissent.

### A. Ex Post Facto Clause

To begin, I note that the majority only considered the intent of the Registration Act.[2] Therefore, it is necessary to analyze the legislature's objective in enacting the Surveillance Act.

As the majority noted, "[w]e must [first] 'ascertain whether the legislature meant the statute to establish 'civil' proceedings.'" *Smith v. Doe*, 538 U.S. 84, 92 (2003) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)). According to the Tennessee legislature, the intent of the Surveillance Act is to "utilize the latest technological solutions to monitor and track serious criminal offenders and violent sex offenders[.]" 2004 Pub. Acts Ch. 899, § 2. Furthermore, the Tennessee legislature declared that "[i]ntensive supervision of serious offenders and violent sex offenders is a crucial element to both the rehabilitation of the released convict and the safety of the surrounding community[,]" and technological solutions, like the satellite-based monitoring program,

> can now also provide law enforcement and correctional professionals with significant
> new tools for electronic correlation of the constantly-updated geographic location of

---

[1] While Doe contends that the newly imposed lifetime sexual registry requirement under the Registration Act violates the Ex Post Facto Clause, this Court, in *Cutshall*, 193 F.3d at 476-77, applied the factors articulated by the Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963), and concluded that the Tennessee Act enacting the sexual registry, and applied retroactively, did not violate the Ex Post Facto Clause. Because this Court has already held that the Tennessee sexual registry, applied retroactively, is not punishment in violation of the Ex Post Facto Clause, Doe's claim (that the Registration Act's new lifetime requirement, applied retroactively, is a violation of the Ex Post Facto clause) must fail.

[2] By considering both the Registration Act and the Surveillance Act as "the 2004 Act," the majority contends that the Tennessee legislature expressed the intent of the Surveillance Act in § 40-39-201 *et seq*. However, the provisions that the majority quoted at length (§ 40-39-201(b)(6) and (8)) *only* apply to the Registration Act (§ 40-39-201, *et seq*). It does not apply to the Surveillance Act, § 40-39-301 *et seq*.

supervised serious offenders and violent sexual offenders following their release with the geographic location of reported crimes, both to possibly link released offenders to crimes or to possibly exclude released offenders from ongoing criminal investigations[.]

*Id* at § 3. As such, "[c]ontinuous twenty-four (24) hours a day, seven (7) days a week electronic monitoring of those convicted of serious and violent sexual offenses is a valuable and reasonable requirement[.]" *Id.* Because monitoring, rehabilitation, and public safety concerns seem to be the legislature's purpose in enacting the Surveillance Act (in particular, the satellite-based monitoring program), the statutory scheme gives no indication that it is criminal. *See Smith*, 538 U.S. at 93 (noting that "nothing on the face of the statute suggests that the legislature sought to create anything other than a civil . . . scheme designed to protect the public from harm." (quotation marks omitted)).

Having found that the legislature's intent is non-punitive, I turn to the analysis of the relevant factors set forth in *Smith* to determine whether the Surveillance Act's scheme is so punitive in purpose or effect as to constitute punishment. *See Smith*, 538 U.S. at 97.

## 1. History and Traditions as Punishment

The practice of requiring sex offenders to wear global monitoring systems for the purposes of continuous monitoring is fairly new. The recent origin of satellite-based monitoring "suggests that the statute was not meant as a punitive measure, or, at least, that it did not involve a traditional means of punishing." *See Smith*, 538 U.S. at 97. However, a closer look at the satellite-based monitoring program, though new, shows that it bears a striking resemblance to historical forms of punishment.

According to Doe, forced enrollment in the satellite-based monitoring program "require[s] [him] to carry . . . at all times when not at his residence a relatively large box which contains the electronics necessary for the monitoring to take place. This box must be worn on [his] person outside any coat or other outer garment and therefore is obvious to any onlooker."[3] Accepting Doe's allegation as true, as I must (under a Rule 12(b)(6) review), the monitoring device is visible to the public when worn and must be worn everywhere Doe goes. Indeed, this would serve as a catalyst for public ridicule—ridicule likened to the punishment of public shaming or humiliation. Public shaming, humiliation, and banishment are well-recognized historical forms of punishments. *See Smith*, 538 U.S. at 97-98; *Femedeer v. Haun*, 227 F.3d 1244, 1250-51 (10th Cir. 2000); *Cutshall*, 193 F.3d at 475; *E.B. v. Verniero*, 119 F.3d 1077, 1099-1100 (3d Cir. 1997).

Therefore, because, in the necessary operation of the Surveillance Act, Doe is required to wear a plainly visible monitoring device at all times in public as well as in private (except in his home), the satellite-based monitoring program results in public shaming and humiliation—both of which are historical methods of punishment. This factor weighs in favor of finding the Surveillance Act effectively punitive.

---

[3] An April 2007 report (the "report") by the Tennessee Board of Parole and Probation reviewing the satellite-based monitoring program confirms Doe's complaint that he must wear a box for the monitoring to take place. *See* http://www2.tennessee.gov/bopp/Press%20Releases/BOPP%20GPS%20Program%20Evaluation,%20April%202007.pdf. According to the report, the box is called the personal tracking unit ("PTU") and is worn on the waist of the offender at all times. The report makes no mention of whether the PTU must be worn on the outside of one's person. However, the report does reveal the manufacturer of the PTU (iSECUREtrac), and an illustration on their website indicates that the PTU is worn on a belt around one's waist, visible for all to see. *See* http://www.isecuretrac.com/downloads/SPECS_20051005_iST_2150_2250.pdf.

## 2. Affirmative Disability or Restraint

Tennessee's satellite-based monitoring program does not impose an affirmative disability or restraint on Doe. While Doe is required to wear a visible monitoring device, he is allowed to move freely, and there is no imposition of physical restraint. Thus, the satellite-based monitoring program "does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *See Smith*, 538 U.S. at 100. This factor weighs against finding the Surveillance Act's scheme punitive in purpose or effect.

## 3. Promotes the Traditional Aims of Punishment

One of the traditional aims of punishment is deterrence. Requiring that a person convicted of a violent sexual offense be monitored via satellite by wearing a visible device will likely promote deterrence. While "[t]o hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' . . . would severely undermine the Government's ability to engage in effective regulation[,]" *Smith*, 538 U.S. at 102 (quotation marks omitted), the "satisfaction of this factor. . . does weigh in . . . favor" of finding the Surveillance Act's satellite-based monitoring program punitive in effect. *See Cutshall*, 193 F.3d at 476.

## 4. A Rational Connection to a Non-Punitive Purpose

"A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *See Smith*, 538 U.S. at 103. Here, the non-punitive purpose of the satellite-based monitoring program is to monitor sex offenders while providing rehabilitation for released offenders and safety for the community. *See* 2004 Pub. Acts Ch. 899, § 3(c). In addition, the monitoring program allows law enforcement officials to "possibly link released offenders to crimes or to possibly exclude released offenders from ongoing criminal investigations[.]" *Id*. at § 3(e). Hence, there is a rational connection to its non-punitive purpose. Consequently, this factor weighs against finding the Surveillance Act's satellite-based monitoring program punitive in purpose or effect.

## 5. Excessiveness

"The excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are *reasonable* in light of the nonpunitive objective." *See Smith*, 538 U.S. at 105 (emphasis added). It is settled that sexual registries are constitutional, and are non-excessive means of protecting the public and the community from sexual offenders. *See id.* at 105-06; *Hatton v. Bonner*, 356 F.3d 955, 967 (9th Cir. 2004); *Fedemeer*, 227 F.3d at 1253; *Cutshall*, 193 F.3d at 477. Tennessee, however, now attempts to enhance the registry requirements by enacting the Surveillance Act which compels (at the discretion of the Tennessee Board of Parole and Probation) offenders to continuously wear relatively large satellite monitoring devices that are obvious to onlookers.

Under the Registration Act, Doe is already tasked with complying with an exhaustive list of requirements which includes filling out a Tennessee Bureau of Investigation form; thereby, making his personal information available for public viewing through the internet-based sexual offender registry. *See* TENN. CODE ANN. § 40-39-204. Now, because of the newly enacted satellite-based monitoring program under the Surveillance Act, Doe must openly wear a relatively large G.P.S. monitoring device—making his offender status known not only to those who choose to inquire (via the World Wide Web), but also to the general public, namely, those who do not actively seek such information. Undeniably, because of the visibly worn monitoring device, Doe's offender status is now known to his co-workers, fellow worshipers at church, onlookers at the mall, diners at restaurants, patrons at gas stations, passengers on planes, trains, or buses, fans at sporting events,

moviegoers at theaters, visitors at museums, sightseers, or any other person who may be at any conceivable location where Doe rightfully chooses to go within his probation limits.

To be sure, my concern was captured in the April 2007 evaluation of the satellite-based monitoring program conducted by the Tennessee Board of Probation and Parole. *See* note 3. In the report, state officials related the following story:

> Shortly after the GPS project was put into place and was covered by the media, one offender reported that he had been verbally assaulted in the parking lot of a retail store. He alleged that a random male approached him saying, "I know what that is, I know who you are," and pointed at the PTU. The offender felt threatened and felt that he would have been physically harmed had he not immediately removed himself from the situation.

Report at 36.

I fail to see how putting all persons in public places on alert as to the presence of offenders, like Doe, helps law enforcement officers *geographically* link offenders to new crimes or release them from ongoing investigations. It equally eludes me as to how the satellite-based monitoring program prevents offenders, like Doe, from committing a new crime. Although the device is obvious, it cannot physically prevent an offender from re-offending. Granted, it may help law enforcement officers track the offender (after the crime has already been committed), but it does not serve the intended purpose of public safety because neither the device, nor the monitoring, serve as actual preventative measures. Likewise, it is puzzling how the regulatory means of requiring the wearing of this plainly visible device fosters rehabilitation. To the contrary, and as the reflection above denotes, a public sighting of the modern day "scarlet letter"—the relatively large G.P.S. device—will undoubtedly cause panic, assaults, harassment, and humiliation. Of course, a state may improve the methods it uses to promote public safety and prevent sexual offenses, but requiring Doe to wear a visible device for the purpose of the satellite-based monitoring program is not a regulatory means that is *reasonable* with respect to its non-punitive purpose.

Sexual offenses unquestionably rank amongst the most despicable crimes, and the government should take measures to protect the public and stop sexual offenders from re-offending. However, to allow the placement of a large, plainly obvious G.P.S. monitoring device on Doe that monitors his every move, is dangerously close to having a law enforcement officer openly escorting him to every place he chooses to visit *for all (the general public) to see*, but without the ability to prevent him from re-offending. As this is clearly excessive, this factor weighs in favor of finding the Surveillance Act's satellite-based monitoring program punitive.

Having found that the Surveillance Act's satellite-based monitoring program, in its necessary operation, (1) has been regarded in our history and traditions as punishment, (2) promotes the traditional aims of punishment, and (3) is excessive with respect to its non-punitive purpose, I must conclude that the punitive effects of the Surveillance Act transformed what Tennessee denominated a civil remedy into a criminal penalty.

Therefore, I would **REVERSE** the district court's finding that the Surveillance Act is constitutional as applied to Doe, and grant the preliminary injunction enjoining the state of Tennessee from enforcing such punishment.